**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert Morris POSTAL, Salem L. Forsythe, and George A. Chitty, Defendants-Appellants.**

No. 77–5354.

United States Court of Appeals, Fifth Circuit.

Feb. 15, 1979.

Eugene E. Hines, Washington, D. C., for Forsythe, Postal and Chitty.

Jack V. Eskenazi, U. S. Atty., Michael P. Sullivan, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before WISDOM, TJOFLAT and VANCE, Circuit Judges.

TJOFLAT, Circuit Judge:

This case presents a consequential issue of international and domestic law that has been noted in this circuit but not yet authoritatively decided: whether a court of the United States can assert jurisdiction over persons arrested aboard a foreign vessel seized beyond the twelve-mile limit in violation of a particular provision of a treaty to which the United States and the foreign country are parties.[1] We hold that such a violation does not divest the court of jurisdiction over the defendants.

The defendants in this case were convicted in a joint bench trial of conspiring to import marijuana into the United States, in violation of 21 U.S.C. § 963 (1976), and of conspiring to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846 (1976). In addition to questioning the jurisdiction of the district court over their persons, the defendants, all of whom appeal, make numerous arguments for reversal, which we shall address in due course. We find none of them persuasive. Therefore, we affirm as to all defendants.

## I. FACTS

Because the facts in this case are significant and somewhat bizarre, we set them forth in detail. Except as otherwise noted, they appear as related by Lt. Beardsworth, Commanding Officer of the Coast Guard cutter *Cape York.*

The *Cape York* first sighted the defendants' vessel *La Rosa,* a fifty-one foot Mor-

---

1. The question was explicitly reserved in *United States v. Winter,* 509 F.2d 975, 983–84 & n.30 (5th Cir.), *cert. denied sub nom. Parks v. United States,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) and not directly posed in *United States v. Cadena,* 585 F.2d 1252 (5th Cir. 1978) (vessel registered to non-ratifying country), or *United States v. Cortes,* 588 F.2d 106 (5th Cir. 1979) (stateless vessel). See note 8 *infra.* See also *United States v. Warren,* 578 F.2d 1058 (5th Cir. 1978) (en banc) (search of United States vessel on the high seas).

gan sailboat, in the morning of September 15, 1976, as the *La Rosa* sailed southwesterly at a point approximately 8.5 miles [2] southeast of Upper Matecumbe Key, the nearest of the Florida Keys.[3] Since the *La Rosa* displayed no flag and exhibited neither name nor home port on her stern, the *Cape York* approached within twenty-five yards, and Lt. Beardsworth inquired as to the origin and destination of the defendants' voyage and the nationality of their ship. This approach occurred some 8.75 miles from the coast.

Two of the defendants held up a flag that was later identified as that of the Grand Cayman Islands, although at the time "there was some doubt as to exactly which country it was." Record, vol. 2, at 55. Defendant Postal responded that his crew was Australian, that the vessel was of Grand Cayman registry, and that they were en route from the Bahamas to Belize, British Honduras.

At this point, the *Cape York* circled the *La Rosa* and withdrew a short distance, where Lt. Beardsworth and Chief Petty Officer Lewis discussed the situation. Lt. Beardsworth decided to call Coast Guard Headquarters Operations Center in Miami, Florida, and he "informed them of the situation that was developing." *Id.* at 61. The *Cape York* again came alongside the *La Rosa*, and Lt. Beardsworth made the same general inquiries. After this exchange, Lt. Beardsworth decided that the *La Rosa* should be boarded to verify her documentation papers, and he ordered her to heave to and stand by for boarding.

Postal refused to allow the boarding. Lt. Beardsworth informed his superiors at the Operations Center, who directed that the boarding be conducted. At approximately this time, Lt. Beardsworth saw Postal holding what he thought to be a pistol.[4] Postal

was again ordered to heave to for boarding, and this time Lt. Beardsworth explained that the boarding was for "violation of international agreements in that the name and the home port were not on the stern." *Id.* at 65. Postal then agreed to receive one boarding officer.

Shortly after this dialogue, the *La Rosa* began to maneuver erratically, apparently to make boarding more difficult. At this time, papers were observed being jettisoned from the *La Rosa*. The crew of the *Cape York* retrieved the papers and discovered that they were pieces of charts and of what appeared to be a ship's log. These scraps revealed that approximately one month previously the *La Rosa* had been in the southern Caribbean near Aruba and at points in South America. See note 42 *infra*. They also made reference to a "contact having been made and so many days more to go." *Id.* at 70.

Before Lt. Beardsworth closely examined these papers, however, CPO Lewis had boarded the *La Rosa*. This boarding took place approximately 10.5 miles from the coast.[5] CPO Lewis testified that he asked Postal for the *La Rosa*'s documentation and the defendants' identifications. CPO Lewis related that Postal agreed to produce the documents but refused to show identification.

CPO Lewis's further testimony revealed that before the documents were produced, Postal asked him the rather startling question "Can you be bought?" *Id.* at 182. CPO Lewis responded that he could not, but Postal persisted, continuing that he had been in the Coast Guard himself but had "found a better way to make a living," and he repeated the previous offer, which was again refused. CPO Lewis asked the defendants, "You guys are not Australians."

2. We refer throughout to nautical miles.

3. In piecing together the facts of this case, we referred to chart No. 11452 of the National Oceanic and Atmospheric Administration (1975), introduced into evidence as Government Exhibit 1.

4. The only firearm that was discovered aboard the *La Rosa* was a Very flare pistol. Record, vol. 2, at 139–40.

5. Although not specifying an exact distance, the district court found that the first boarding occurred within 12 miles. Record, vol. 2, at 335. Since this finding is not clearly erroneous, we take it as established.

They jokingly replied, "Why, don't we sound like them?" *Id.* at 171. CPO Lewis also noted that the *La Rosa*'s hatches, which had been open before his boarding, were now closed and that Chitty was sitting on the forward hatch. *Id.* at 170. At sometime during this boarding, one of the defendants asked, "Aren't we outside of the 12-mile limit?" *Id.*, vol. 3, at 218.

The documents were produced, and among them was a registry from the Grand Cayman government. CPO Lewis radioed the information concerning the *La Rosa*'s registry to the *Cape York*, after which he was ordered to return to the *Cape York*. At no time during this boarding were the defendants given *Miranda* warnings.

During the ten to fifteen minutes that CPO Lewis was aboard the *La Rosa*, the *Cape York* had been in constant contact with the Operations Center in Miami. The information relating to the documents was relayed to Miami, and CPO Lewis was ordered to return because the *La Rosa*'s registry was verified. Upon his return, CPO Lewis related the events that had transpired while he was aboard the *La Rosa*. He told Lt. Beardsworth, "I think these guys are dirty." *Id.*, vol. 2, at 176. By this he meant, of course, that he believed the *La Rosa* to be transporting contraband.

These circumstances were also reported to Coast Guard officials at the Operations Center in Miami, and they ordered the *Cape York* to maintain overt surveillance of the *La Rosa*. Immediately after CPO Lewis returned to the *Cape York*, the *La Rosa* changed from her initial course of 235° (approximately southwest by west) to one varying between 235° and 200° (approximately south by southwest), thus taking her from a course roughly parallel to the coast to one up to 35° away from the coast. *Id.* at 84, 114–17. This somewhat erratic course was maintained throughout the surveillance period.

Lt. Beardsworth conferred with the Operations Center at some length as to the proper course of action to be taken. Eventually, the decision was made to board the *La Rosa* and conduct a customs search, at which time general quarters was sounded and the *La Rosa* was approached under a show of force. She was boarded for the second time some two and one-half to three hours after the first boarding. By this time the *La Rosa*'s course had taken her outside the twelve-mile limit, and the second boarding transpired perhaps some 16.3 miles from the nearest United States coastline.[6]

The second boarding party consisted of CPO Lewis, who was armed with a .45 calibre pistol, and two other Coast Guardsmen, one of whom ported a shotgun. CPO Lewis testified that he read the defendants their *Miranda* rights immediately upon this boarding. The defendants, who had been sampling their wares and imbibing spirits in the interim, were in a rather odd mood.[7] As the rights were being read, Postal exclaimed, "Hey, he's reading us our rights. Gather around." *Id.*, vol. 3, at 200. After the rights were read, Postal asked, "What does that mean?" *Id.* The rights were read again, and the defendants refused to waive them. Postal, sighting Lt. Beardsworth on the wing of the bridge, yelled to him, "Congratulations. This will help your career." *Id.* Defendant Chitty then said, "Let's quit hassling, they're only doing their job." *Id.* at 204. Defendant Forsythe walked to the forward hatch, and, opening it, disclaimed, "Let it be known that I didn't say I was Australian." *Id.* at 205. Postal added, "Oh, does that mean you want to see the pot?" *Id.*

CPO Lewis peered into the hatch and saw numerous bales "of what looked like marijuana," one of which was open. *Id.* at 205. He inquired how much there was, and Postal responded, "About eight thousand pounds

---

6. This was the distance given by the defendants' expert witness. Record, vol. 3, at 311. The Coast Guard took no fix at the time of the second boarding. The Government stipulated that the second boarding took place beyond the 12-mile limit. *Id.*, vol. 2, at 77.

7. CPO Lewis responded on cross-examination that the defendants appeared "stoned" at this point. Record, vol. 3, at 223.

. . .. About two and a half million dollars." *Id.* at 206. The defendants were then arrested, after which they offered CPO Lewis a drink and proclaimed, "We're celebrating, first time we've been busted." *Id.* at 233. At this point, CPO Lewis asked Forsythe whether he was "really going to Belize?" Forsythe responded only, "No." *Id.* at 209.

The defendants were removed to the *Cape York,* and the *La Rosa* was taken in tow. Shortly thereafter, Lt. Beardsworth readvised each of the defendants of his *Miranda* rights, and each declined to make any statement at this time other than to give his name and address. CPO Lewis proceeded to search the *La Rosa,* and photographs were taken. He noted that there was little food on board and that what meat there was, was putrefied.

Most of the remaining significant events were related at trial by Chief Machinery Technician Gaskill, who was watching over the defendants after they had been transferred to the *Cape York.* A few hours after the arrests, Chitty volunteered to Chief Gaskill, "We made a mistake by throwing the papers overboard and not— laying [*sic*] offshore until a pickup." *Id.* at 247, 269. Gaskill also testified that he overheard a conversation between Postal and Forsythe in which both stated, "It was to be an $80,000—one-time shot for $80,000." *Id.* at 248.

One additional occurrence is noteworthy. Lt. Beardsworth testified that, during the return trip to Miami, Postal mentioned that the *La Rosa* was almost out of fuel. *Id.* at 159, 167.

## II. ANALYSIS

We noted at the outset of this opinion that the substantial issue in this case concerns the effect of a treaty violation on the jurisdiction of the court over the defendants. This question involves the complex relationship between domestic and international law. Before we address this important issue, we examine the applicable treaty provisions to establish that they were indeed breached.

### A. *The Treaties*

The treaties of concern are the Convention on the High Seas, *opened for signature* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962), and the Convention on the Territorial Sea and the Contiguous Zone, *opened for signature* April 29, 1958, 15 U.S.T. 1606, T.I.A.S. No. 5639 (entered into force Sept. 10, 1964). These treaties set forth principles of international law governing the relations of the ratifying states [8] with respect to territorial seas, those waters adjacent to a state's coast and subject to its sovereignty, and to the high seas, those waters lying seaward of the territorial seas and subject to the sovereignty of no state. *United States v. Louisiana,* 394 U.S. 11, 22–23, 89 S.Ct. 773, 780–81, 22 L.Ed.2d 44 (1969); *United States v. Warren,* 578 F.2d 1058, 1064–65 n.4 (5th Cir. 1978) (en banc).[9]

---

**8.** The record reflects that the *La Rosa* was of Grand Cayman registry. Record, vol. 2, at 4. The Grand Cayman Islands are a territory of the United Kingdom, which ratified the Convention on the High Seas and the Convention on the Territorial Sea and Contiguous Zone on March 14, 1960. Under United Kingdom practice, treaties entered into by the United Kingdom apply to all its territories unless subject to provision to the contrary. A. McNair, *The Law of Treaties* 116–17 (1961). The ratification papers make no exception for the Grand Caymans, and, therefore, the conventions are operative with respect to vessels of Grand Cayman registry.

That the *La Rosa* is the registered vessel of a ratifying state distinguishes this case from our recent decisions in *United States v. Cadena,*

585 F.2d 1252 (5th Cir. 1978), and *United States v. Cortes,* 588 F.2d 106 (5th Cir. 1979). In *Cadena,* a freighter of Canadian registry was seized some 200 miles at sea. Canada had not ratified the Convention on the High Seas, and we held that the provisions of the treaty were unavailable to the defendants for that reason. 585 F.2d at 1261–62. Similarly, in *Cortes* we held the treaty afforded no protection to a stateless vessel boarded on the high seas. 588 F.2d at 110.

**9.** The third maritime area consists of the internal waters of a state. These waters include the state's "rivers, lakes, and canals within its land area and . . . the areas of sea on the landward side of the baseline of the territorial sea." *Restatement (Second) of Foreign Rela-*

The territorial sea, although defined in the Convention on the Territorial Sea and the Contiguous Zone,[10] is not delimited by these conventions. The limits asserted by coastal states are therefore to be judged under customary international law. Jessup, *The United Nations Conference on the Law of the Sea*, 59 Colum.L.Rev. 234, 246 (1959); *see Anglo Norwegian Fisheries Case,* [1951] I.C.J. 116, 132. The United States has long adhered to the widely accepted international rule that the territorial sea extends to three miles from the coast. *E. g., United States v. California*, 332 U.S. 19, 33–34, 67 S.Ct. 1658, 1666, 91 L.Ed. 1889 (1947); *Cunard Steamship Co. v. Mellon*, 262 U.S. 100, 122–23, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923); P. Jessup, *The Law of Territorial Waters and Maritime Jurisdiction* 49–60 (1927). The sovereignty of the coastal state extends into the territorial sea, Convention on the Territorial Sea and the Contiguous Zone art. 1, with the proviso that foreign vessels enjoy the right of innocent passage through it.[11] *Id.* art. 14–23.

Beyond the territorial sea lie the high seas. *See* Convention on the High Seas art. 1. These waters are freely accessible to all nations and are not subject to the sovereignty of any nation. *Id.* art. 2. The regulation of a vessel on the high seas is normally the responsibility of the nation whose flag that vessel flies, and of that nation alone. *Id.* arts. 5, 6. Article 6 provides, in pertinent part, "Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas."

The exclusivity of the flag nation's jurisdiction over its ships on the high seas is indeed qualified by provisions in both treaties. Article 24 of the Convention on the Territorial Sea and Contiguous Zone establishes a belt of the high seas contiguous to the territorial sea. In this zone the coastal state is justified in interfering with foreign vessels in certain limited instances. Article 24 provides in part as follows:

1. In a zone of the high seas contiguous to its territorial sea, the coastal State may exercise the control necessary to:

(a) Prevent infringement of its customs, fiscal, immigration or sanitary regulations within its territory or territorial sea;

(b) Punish infringement of the above regulations committed within its territory or territorial sea.

2. The contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured.

Although section 2 of article 24 limits to twelve miles the breadth of the zone in which a coastal state may exercise control for the purposes enumerated in that article, article 23 of the High Seas Convention authorizes hot pursuit of foreign vessels beyond twelve miles. It provides, in pertinent part:

1. The hot pursuit of a foreign ship may be undertaken when the competent authorities of the coastal State have good reason to believe that the ship has violated the laws and regulations of that State.

---

tions *Law of the United States* § 13 (1965); *see* Convention on the Territorial Sea and the Contiguous Zone art. 5. These waters are considered a part of the state's territory, and therefore the state may exclude foreign vessels altogether, *United States v. Louisiana*, 394 U.S. 11, 22, 89 S.Ct. 773, 780, 22 L.Ed.2d 44 (1969), subject to the right of entry in distress. *Restatement, supra,* § 48. The conventions in issue here, although delimiting the outward boundary of the inland water by establishing the method of determining the baseline of the territorial sea, which is adjacent to the inland waters, do not define rights and obligations within the inland waters.

10. Article 6 defines the territorial sea as those waters lying between the baseline and "the line every point of which is at a distance from the nearest point of the baseline equal to the breadth of the territorial sea."

11. The right of innocent passage is the right of foreign vessels to pass through the territorial sea in a manner that "is not prejudicial to the peace, good order or security of the coastal state." *Id.* art. 4; *see* 4 M. Whiteman, *Digest of International Law* 343–480 (1965).

Such pursuit must be commenced when the foreign ship or one of its boats is within the internal waters or the territorial sea or the contiguous zone of the pursuing State, and may only be continued outside the territorial sea or the contiguous zone if the pursuit has not been interrupted . . . . If the foreign ship is within a contiguous zone, as defined in article 24 of the Convention on the Territorial Sea and the Contiguous Zone, the pursuit may only be undertaken if there has been a violation of the rights for the protection of which the zone was established.

Another exception to the principle of noninterference on the high seas, traditionally known as the right of approach or visitation, is embodied in article 22 of the Convention on the High Seas, which provides, in pertinent part, as follows:

1. Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her unless there is reasonable ground for suspecting:

(a) That the ship is engaged in piracy; or

(b) That the ship is engaged in the slave trade; or

(c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.

2. In the cases provided for in subparagraphs (a), (b) and (c) above, the warship may proceed to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration.

These are the principal provisions that we must construe to decide this case. The defendants argue that the boardings and seizure of the La Rosa breached the conventions and cannot be justified under the doctrine of hot pursuit. We agree that the second boarding of the La Rosa, which occurred beyond the twelve-mile limit, was not justifiable under the conventions, but we disagree as to the first, which occurred within. We shall begin our analysis with the first boarding.

## 1. The First Boarding

■ The record reflects that the initial boarding of the La Rosa was not prompted by suspicion that she was in violation of any of the regulations enumerated in article 24 of the Convention on the Territorial Sea and Contiguous Zone, i.e., customs, fiscal, immigration, and sanitary laws. We may assume, without deciding, that the boarding of a foreign vessel on the high seas is not within the authority of article 24 in the absence of some particularized suspicion that one of the enumerated regulations has been or will be violated,[12] for we find that the boarding was justified by another doctrine of international maritime law, the right of approach.

As we have noted, the right of approach is codified in article 22 of the Convention on the High Seas, which provides that the boarding of a foreign *merchant* ship is not justified unless there is reasonable suspicion that the ship is engaged in piracy, the slave trade, or is the same nationality as the

---

12. It has been suggested by several commentators that boardings of foreign vessels to enforce customs laws must be predicated upon some suspicion to comport with international law. *See* W. Masterson, *Jurisdiction in Marginal Seas* 229–30 (1929); Carmichael, *At Sea with the Fourth Amendment*, 32 U.Miami L.Rev. 51, 102 (1977). The rule regarding the boarding and inspection of American flag vessels by the Coast Guard should be contrasted. American vessels are subject to boarding for documenta-

tion and safety inspections without suspicion of illegality. *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc).

The boarding of a vessel on the high seas by its flag state is not an international event. The consequences are solely a domestic matter. The boarding of a foreign vessel is, of course, a matter of international concern that might call for more restraint on the part of the boarding state. *See Lauritzen v. Larsen*, 345 U.S. 571, 582, 73 S.Ct. 921, 928, 97 L.Ed. 1254 (1953).

warship.[13] Since the article merely prohibits the boarding of merchant vessels except for the limited purposes set forth, it does not expressly address the situation of the boarding of foreign private *pleasure* craft, which, from all appearances, the *La Rosa* appears to have been. See part II. 2 *infra.* We think it follows, however, that a justification for boarding a merchant vessel would apply a fortiori to a pleasure craft.[14]

We find that the boarding of the *La Rosa* comes within the exception in article 22 for suspicion that the foreign ship is of United States nationality. The record discloses ample grounds for suspecting the *La Rosa*'s nationality. She was flying no flag and exhibited neither name nor home port on her stern. The absence of these outwardly visible manifestations of nationality is surely cause for suspicion in view of the obligation imposed by most national shipping laws that registered vessels fly the flag of the state of national character. M. McDougal & W. Burke, *The Public Order of the Oceans* 1121 (1962). Moreover, "[e]very State must register the names of all private vessels sailing under its flag, and it must make them bear their names visibly so that every vessel may be identified at a distance." 1 L. Oppenheim, *International Law* 597 (8th ed. Lauterpacht 1955); *e. g.*, 46 U.S.C. §§ 45, 46, 103 (1970).

The record does show that upon inquiry the crew of the *La Rosa* exhibited what was later determined to be a Grand Cayman flag and that Postal claimed that the *La Rosa* was of Grand Cayman registry. The mere display of a flag and claim of nationality is not conclusive, however. *See* M. McDougal & W. Burke, *supra,* at 1120; 1 L. Oppenheim, *supra,* at 604. Accordingly, article 22 provides that if suspicions persist, the foreign vessel may be boarded to verify the ship's right to fly its flag. Lt. Beardsworth testified that he could not clearly discern the nationality of the flag displayed

by the *La Rosa*'s crew and that the absence of name and home port caused him to be doubtful as to the vessel's true nationality. Record, vol. 2, at 55, 63. After conferring with the Operations Center in Miami, the decision was made to board the *La Rosa* to verify the nationality, and article 22 was cited as authority for the boarding. *See id.* at 107.

We think it clear, therefore, that there were reasonable grounds to doubt that the *La Rosa* was of Grand Cayman registry, but article 22 requires that the vessel approached must be suspected of being of the nationality of the approaching warship. Viewing the circumstances objectively, as we must, *see Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), we think it would have been reasonable to suspect that the *La Rosa* was of American nationality. The *La Rosa* was sailing in close proximity to the coast of the United States. When first hailed, the crew displayed a flag of uncertain identity, claimed to be of Grand Cayman registry, and said they were Australians enroute to Belize. The crewman who answered, however, had no discernible accent. After initially refusing to heave to for boarding, Postal relented, but the *La Rosa* then proceeded to maneuver evasively in an attempt to prevent boarding. At this point the crew began jettisoning papers over the side. On the basis of all these facts, we think that it was reasonable for the Coast Guard to conclude that the *La Rosa* was not of the registry she claimed to be and, from her diligent efforts to evade a United States Coast Guard vessel in United States waters, that she was in all likelihood an American vessel making a last ditch effort to avoid apprehension. Although we do not find these circumstances compelling grounds for suspecting that the *La Rosa* was of American registry, we find the inference a reasonable one. Therefore, we find CPO Lewis's initial boarding to verify the *La Rosa*'s

13. Coast Guard vessels qualify as war ships. *See United States v. Cadena*, 585 F.2d 1252, 1260 n.16 (5th Cir. 1978); Convention on the High Seas art. 8(2).

14. This is not to say, as we shall demonstrate below, that a foreign pleasure craft may avail itself of article 22's prohibition on boardings of merchant vessels for purposes other than those set forth.

documentation within the ambit of article 22.[15]

### 2. The Second Boarding

We do conclude, however, that the second boarding of the *La Rosa*, which by stipulation occurred beyond the twelve-mile limit, was in violation of article 6 of the High Seas Convention. As we have seen, that article proclaims the exclusive jurisdiction of a nation over its vessels, subject only to treaty provision to the contrary. We find that article 6 was infracted because no treaty provision justifies the second boarding or the ultimate seizure of the *La Rosa*. The only arguably applicable treaty provisions that might justify the boarding and search are those of hot pursuit and the right of approach. We shall discuss them in order below.

Under section 1 of article 23 of the High Seas Convention, set forth above, hot pursuit "must be commenced when the foreign ship . . . is within the internal waters or the territorial sea or the contiguous zone of the pursuing State, and may only be continued outside the territorial sea or the contiguous zone if the pursuit has not been interrupted." We conclude below that ample probable cause arose within the contiguous zone, by virtue of the first boarding, to believe that the *La Rosa* had violated customs laws. And we may assume that the pursuit of the *La Rosa* was uninterrupted; but the crucial question remains: When, if ever, did *hot* pursuit commence? The answer is supplied by section 3 of article 23, which provides in relevant part as follows:

> Hot pursuit is not deemed to have begun unless the pursuing ship has satisfied itself by such practicable means as may

be available that the ship pursued [is] within the limits of the territorial sea, or as the case may be within the contiguous zone. The pursuit may only be commenced after visual or auditory signal to stop has been given at a distance which enables it to be seen or heard by the foreign ship.

As one author who has exhaustively treated the subject of hot pursuit writes, "The practical importance of these prerequisites is that if the foreign vessel succeeds in reaching the high seas before these conditions have been met, hot pursuit is not considered lawfully commenced and no continuation of the pursuit may take place on the high seas." N. Poulantzas, *The Right of Hot Pursuit in International Law* 200 (1969).

■ As regards the first prerequisite to the commencement of hot pursuit, the determination of location, the record reflects that the *Cape York* took a radar fix at the time of the first boarding. Record, vol. 2, at 130. We may assume, without deciding, that such means satisfy the requirement that position be determined by "such practical means as may be available," *see* N. Poulantzas, *supra*, at 201–04, for it is clear that the second prerequisite, the giving of visual and auditory signals to stop, did not occur until immediately before the second boarding, which took place beyond the twelve-mile limit. As Dr. Poulantzas points out, "the signal to stop . . . is of considerable significance since pursuit is considered to have lawfully started only at the moment when a signal to stop is clearly given to the suspected vessel." *Id.* at 204; *see Gillam v. United States*, 27 F.2d 296, 299 (4th Cir. 1928). We conclude, therefore, that the doctrine of hot pursuit is not available on these facts.

---

**15.** Statutory authority for this boarding is found in 19 U.S.C. § 1581(a) (1976), which provides that customs officers (defined to include Coast Guard officers by 14 U.S.C. § 89(b) (1976) and 19 U.S.C. §§ 1401(i), 1709(b) (1976)) "may at any time go on board of any vessel . . . at any place . . . within the customs waters [defined in 19 U.S.C. § 1401(j) (1976) as those waters within twelve miles of the Coast of the United States] . . . and examine the manifest and other documents and papers." Customs regulations also validat-

ed the boarding. 19 C.F.R. § 162.3 (1978). *See United States v. Freeman*, 579 F.2d 942, 945 n.4 (5th Cir. 1978).

We need not decide whether the Coast Guard would have been justified, under article 22, in boarding the *La Rosa* at the point at which Lt. Beardsworth ordered her to heave to. We measure the permissibility of the boarding on the basis of all the facts and circumstances known as of the time of the actual boarding and find it justified.

Turning again to article 22 of the High Seas Convention, we find it wholly inapplicable here. First, it is not available to the Coast Guard as a justification for the second boarding because there could have been no reasonable suspicion that the *La Rosa* was engaged in piracy or the slave trade or that she was not of Grand Cayman registry. The record discloses absolutely no evidence that would have supported any suspicion that she was pirating or slaving, and the first boarding was aborted precisely because her registry was conclusively verified. Second, article 22 is not available to the defendants as a prohibition on the boarding independent of the general prohibition of article 6 since it prohibits a warship from engaging "foreign *merchant* vessels" unless one of the three enumerated exceptions is applicable. *See United States v. Cadena,* 585 F.2d 1252, 1260 (5th Cir. 1978) (seizure of foreign freighter beyond twelve miles may violate article 22) (dictum). The article contains no express prohibition on the boarding of nonmerchant ships. The Conventions do not define "merchant ship," *cf. Calmar Steamship Corp. v. United States,* 345 U.S. 446, 456, 73 S.Ct. 733, 738, 97 L.Ed. 1140 (1953) (defining merchant ship as one "operated for hire" for purposes of § 2 of the Suits in Admiralty Act, 46 U.S.C. § 742 (1970) ), but we need not define the term here, for the defendants do not claim that the *La Rosa* was a merchant vessel. Indeed, in their brief to this court they claim that she was merely a pleasure craft. Joint Brief for the Defendant-Appellants at 23 n.2.

Having determined that the second boarding of the *La Rosa* cannot be justified as within the hot pursuit provisions of article 23 of the Convention on the High Seas or the right of approach provisions of article 22, we find that article 6 of the Convention on the High Seas was violated. This conclusion, however, does not end our inquiry; the issue remains as to the effect of the violation upon the defendants' convictions. To this important issue we now turn.

### B. *The Effect of the Treaty Violation*

The defendants contend that because the second boarding was in violation of a treaty obligation of the United States, the district court did not have jurisdiction over them. We would summarily dismiss the defendants' contention, under the authority of ample precedent, if it concerned a mere violation of law not embodied in a treaty binding on the United States. A defendant may not ordinarily assert the illegality of his obtention to defeat the court's jurisdiction over him. *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 511–12, 96 L.Ed. 541 (1952); *Ker v. Illinois,* 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421 (1886); *United States v. Quesada,* 512 F.2d 1043, 1045 (5th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975); *United States v. Winter,* 509 F.2d 975, 985–86 (5th Cir.), *cert. denied sub nom. Parks v. United States,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Voigt v. Toombs,* 67 F.2d 744 (5th Cir. 1933), *cert. dismissed,* 291 U.S. 686, 54 S.Ct. 442, 78 L.Ed. 1072 (1934). This proposition, the so-called *Ker-Frisbie* doctrine, is equally valid where the illegality results from a breach of international law not codified in a treaty.[16] *United States v. Cadena,* 585 F.2d 1252, 1259–60 (5th Cir. 1978); *United States v. Winter,* 509 F.2d at 988–89; *Autry v. Wiley,* 440 F.2d 799, 802 (1st Cir. 1971); *see United States v. Quesada* ; *United States v. Lopez,* 542 F.2d 283 (5th Cir. 1976) (per curiam). These precedents

---

16. Commentators have roundly criticized this principle, largely on the basis that courts should not implicitly sanction violations of international law. *E. g.,* Dickinson, *Jurisdiction Following Seizure or Arrest in Violation of International Law,* 28 Am.J.Int'l L. 231 (1934); *Harvard Research Draft Convention on Jurisdiction with Respect to Crime,* art. 16, *reprinted in* 29 Am.J.Int'l L. 435, 623–32 (Supp.1935); Morgenstern, *Jurisdiction in Seizures Effected in Violation of International Law,* 29 Brit.Y.B. Int'l L. 265 (1952); Scott, *Criminal Jurisdiction of a State Over a Defendant Based upon Presence Secured by Force or Fraud,* 37 Minn.L. Rev. 91 (1953). Since we are bound by the precedence of *Ker* and *Frisbie,* we have no occasion to reexamine their wisdom.

rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*Frisbie v. Collins*, 342 U.S. at 522, 72 S.Ct. at 512.[17]

Where a treaty has been violated, the rules may be quite different, as was demonstrated by the Supreme Court in the case of *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933). *Cook* involved a libel brought against the British vessel *Mazel Tov*, which had been seized for smuggling liquor into the United States. The Court held that the seizure had been effected in violation of a treaty between the United States and Great Britain.[18] The Court recognized the forfeiture principle paralleling the *Ker-Frisbie* doctrine that the wrongful acquisition of property against

which a libel has been filed does not affect the court's jurisdiction over the property. 288 U.S. at 121, 53 S.Ct. at 312. It went on, however, to hold this principle inapplicable because the United States "had imposed a territorial limitation upon its own authority" by entering into the treaty. *Id.* "Our government, lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws." *Id.*

The result in *Cook* had been presaged by the Supreme Court in *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927), a prosecution for conspiracy to violate the liquor smuggling statutes. That case concerned the same treaty construed in *Cook*, and the Court expressly distinguished *Ker v. Illinois*.

> The Solicitor General [asserts], on the authority of *Ker v. Illinois* . . . , that an illegal seizure would not have ousted the jurisdiction of the court to try the defendants. But the Ker Case does not apply here. It related to a trial in a state court, and this court found that the illegal seizure of the defendant therein vio-

17. In *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), the Second Circuit indicated that the precedence of *Frisbie* had been eroded by Supreme Court decisions establishing expanded notions of due process, such as *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding that due process requires exclusionary rule to be applied in state trials). 500 F.2d at 272–73. The court in *Toscanino* held that the due process violation found there acted to divest the district court of jurisdiction over a defendant who had been forcibly abducted from Uruguay. The defendant had been subjected to brutal torture and incessant interrogation for some 17 days.

The Second Circuit has, however, limited *Toscanino* to its outrageous facts. In *Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975), the court refused to extend the *Toscanino* rationale to a defendant who had not been subjected to the "cruel, inhuman and outrageous treatment allegedly suffered by Toscanino." *Id.* at 65. The court continued, "Lacking from Lujan's petition is any allegation of that complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process." *Id.* at 66.

This circuit has declined to follow the *Toscanino* rationale, *United States v. Winter*, 509

F.2d at 987; *United States v. Herrera*, 504 F.2d 859, 860 (5th Cir. 1974), and its continuing validity is questionable after the intervening Supreme Court decision in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), in which the Court refused to "retreat from the established rule that illegal arrest or detention does not void a subsequent conviction." *Id.* at 119, 95 S.Ct. at 865 (citing *Frisbie* and *Ker*). We need not explore the issue of *Toscanino*'s continuing vitality here because the record is devoid of even the slightest evidence of abuse on the part of the Coast Guard. Indeed, it was only because the Coast Guard exercised an abundance of caution in attempting to determine whether the second boarding was justifiable under international law that the *La Rosa* was able to cross over the 12-mile limit before she was seized.

18. The treaty permitted the seizure of British vessels reasonably suspected of liquor smuggling, but only within one hour's sailing distance of the coast. Convention for Prevention of Smuggling of Intoxicating Liquors, Jan. 23, 1924, United States-Great Britain, 43 Stat. 1761, quoted in note 32 *infra*. The *Mazel Tov* was apprehended beyond the hour's sailing distance but within the twelve-mile customs enforcement zone established by statute.

lated neither the federal Constitution, nor a federal law, nor a treaty of the United States, and so that the validity of their [sic] trial after alleged seizure was not a matter of federal cognizance. Here a treaty of the United States is directly involved, and the question is quite different.

273 U.S. at 605–06, 47 S.Ct. at 535. Although the convictions in *Ford* were affirmed because the defendants had not timely raised the jurisdictional issue, the just-quoted dictum was given operative effect in two criminal prosecutions concerning seizures in violation of a treaty between the United States and Panama that was essentially the same as the treaty construed in *Cook* and *Ford*. In *United States v. Schouweiler*, 19 F.2d 387 (S.D.Cal.1927), and *United States v. Ferris*, 19 F.2d 925 (N.D.Cal. 1927), pleas to the jurisdiction of the district court were sustained, and the prosecutions were dismissed.

*Cook* and *Ford* must be viewed in the fuller context of treaty law to appreciate their reasoning, for it is not true that every treaty to which the United States is a party acts to limit the jurisdiction of its courts. Article 6 of the United States Constitution declares treaties made "under the Authority of the United States [to] be the supreme Law of the Land," but it was early decided that treaties affect the municipal law of the United States only when those treaties are given effect by congressional legislation or are, by their nature, self-executing. *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 311, 7 L.Ed.

415 (1829); *Sei Fujii v. State*, 38 Cal.2d 718, 242 P.2d 617 (1952); Dickinson, *Are the Liquor Treaties Self-Executing?*, 20 Am.J. Int'l L. 444 (1926). In *Whitney v. Robertson*, the Court explained:

A treaty is primarily a contract between two or more independent nations, and is so regarded by writers on public law. For the infraction of its provisions a remedy must be sought by the injured party through reclamations upon the other. When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect . . . . If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment.

124 U.S. at 194, 8 S.Ct. at 458.

Most significantly, the court in *Cook* declared the treaty in issue there to be self-executing. "[I]n a strict sense the Treaty was self-executing, in that no legislation was necessary to authorize executive action pursuant to its provisions." 288 U.S. at 119, 53 S.Ct. at 311 (footnote omitted). The Court went on to hold that the treaty, being self-executing and therefore equivalent to federal legislation, superseded a customs statute that would otherwise have validated the seizure. *Id.*; see note 18 *supra*.

We read *Cook* and *Ford* to stand for the proposition that self-executing treaties may act to deprive the United States, and hence its courts, of jurisdiction over property and individuals that would otherwise be subject to that jurisdiction.[19] The

**19.** In *United States v. Winter*, 509 F.2d 975 (5th Cir.), *cert. denied sub nom. Parks v. United States*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), we intimated in dictum that the *Ford* decision "may well have been significantly undermined even on its own facts, by *Frisbie*." *Id.* at 989. *Ford*, it will be recalled, distinguished *Ker* on the basis that no federal law had been violated by Ker's illegal abduction and therefore "that the validity of their [sic] trial after alleged seizure was not a matter of federal cognizance." 273 U.S. at 605–06, 47 S.Ct. at 535. The Court in *Frisbie*, however, assumed that the defendant had been abducted in violation of the federal kidnapping statute

and held that the court's jurisdiction over him was valid notwithstanding. 342 U.S. at 522–23, 72 S.Ct. at 512.

We cannot construe *Frisbie* to overrule either *Ford* or *Cook* because the cases are distinguishable. As the Court in *Frisbie* stated, the federal kidnapping statute was not designed to limit the jurisdiction of the courts but merely to punish and deter kidnapping. 342 U.S. at 522–23, 72 S.Ct. at 512; Scott, *Criminal Jurisdiction of a State Over a Defendant Based Upon Presence Secured by Force or Fraud*, 37 Minn.L. Rev. 91, 95 (1953). The treaty involved in *Ford* and *Cook*, however, was construed by the Court as a self-imposed limitation on the juris-

law of treaties teaches, however, that treaties may have this effect only when self-executing. Therefore, the determinative issue in the case before us is whether article 6 of the Convention on the High Seas is self-executing. *See* Ficken, *The 1935 Anti-Smuggling Act Applied to Hovering Narcotics Smugglers Beyond the Contiguous Zone: An Assessment Under International Law,* 29 U.Miami L.Rev. 700, 724–27 (1975).[20] We hold that it is not.

■ The question whether a treaty is self-executing is a matter of interpretation for the courts when the issue presents itself in litigation, *Restatement (Second) of Foreign Relations Law of the United States* § 154(1) (1965), and, as in the case of all matters of interpretation, the courts attempt to discern the intent of the parties to the agreement so as to carry out their manifest purpose. *Board of County Commissioners v. Aerolineas Peruanasa,* 307 F.2d 802, 806 (5th Cir. 1962), *cert. denied,* 371 U.S. 961, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963); A. McNair, *Law of Treaties* 365 (1961); 1 D.

O'Connell, *International Law* 271 (1965). The parties' intent may be apparent from the language of the treaty, or, if the language is ambiguous, it may be divined from the circumstances surrounding the treaty's promulgation. *Cook,* 288 U.S. at 112, 53 S.Ct. at 308; *Diggs v. Richardson,* 180 U.S. App.D.C. 376, 555 F.2d 848, 851 (D.C.Cir. 1976); *Johansson v. United States,* 336 F.2d 809, 813 (5th Cir. 1964).

The self-execution question is perhaps one of the most confounding in treaty law.[21] "Theoretically a self-executing and an executory provision should be readily distinguishable. In practice it is difficult." Reiff, *The Enforcement of Multipartite Administrative Treaties in the United States,* 34 Am.J.Int'l L. 661, 669 (1940). A treaty may expressly provide for legislative execution. An example is found in articles 27 through 29 of the Convention on the High Seas, each of which begins with the preamble "Every State shall take the necessary legislative measures to . . . ."[22] Such

diction of the United States and hence on that of its courts. Therefore, we find the precedent established in *Ford* and *Cook* vital. *See United States v. Cadena,* 585 F.2d 1252, 1260 (5th Cir. 1978) (dictum).

**20.** Ficken suggests that an unwarranted seizure of a foreign vessel beyond the 12-mile limit would be a violation of article 24 of the Convention on the Territorial Sea and Contiguous Zone. 29 U.Miami L.Rev. at 725. That provision, however, merely permits a coastal state to exercise control for limited purposes within a zone extending from the seaward border of the territorial sea to a maximum of 12 miles from the baseline of the territorial sea. It does not, by its terms, prohibit boardings or seizures beyond the contiguous zone or, for that matter, boardings or seizures within the zone for purposes other than those enumerated, *see United States v. F/V Taiyo Maru,* 395 F.Supp. 413, 419–20 (D.Me.1975) (enforcement of fishing laws). Therefore, we do not believe that article 24 is implicated here.

**21.** As noted in a memorandum prepared for the use of the Legal Advisor of the State Department, "An examination of adjudicated cases and of some treatises and of some of the law reviews has failed to disclose a clear definition of the term 'Self-Executing Treaty'." Memorandum from Attorney Advisor Diven to Legal Advisor Gross, *Definition of "Self-Executing Treaty,"* MS. Department of State, file

711.009/4–2248 (April 22, 1948), *reprinted in* 14 M. Whiteman, *Digest of International Law* 304 (1970). This observation could not be better illustrated than by the cases of *Foster v. Neilson,* 27 U.S. (2 Pet.) 253 (1829) and *United States v. Percheman,* 32 U.S. (7 Pet.) 50, 8 L.Ed. 604 (1833), each of which construed the Florida cession treaty with Spain. In *Foster,* Chief Justice Marshall held the English text of the treaty not to be self-executing. He later repudiated this interpretation in *Percheman,* where the Spanish text was consulted and held to be self-executing.

**22.** The full texts of these provisions follow:
*Article 27*
Every State shall take the necessary legislative measures to provide that the breaking or injury by a ship flying its flag or by a person subject to its jurisdiction of a submarine cable beneath the high seas done wilfully or through culpable negligence, in such a manner as to be liable to interrupt or obstruct telegraphic or telephonic communications, and similarly the breaking or injury of a submarine pipeline or high-voltage power cable shall be a punishable offence. This provision shall not apply to any break or injury caused by persons who acted merely with the legitimate object of saving their lives or their ships, after having taken all necessary precautions to avoid such break or injury.

provisions are uniformly declared executory. *See Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 311–12, 7 L.Ed. 415 (1829); Dickinson, *supra,* at 448. And it appears that treaties cannot affect certain subject matters without implementing legislation. "A treaty cannot be self-executing . . . to the extent that it involves governmental action that under the Constitution can be taken only by the Congress." *Restatement (Second) of Foreign Relations Law of the United States* § 141(3) (1965). Thus, since article 1, section 9 of the Constitution prohibits the drawing of money from the treasury without congressional enactment, it is doubtful that a treaty could appropriate moneys. *The Over the Top,* 5 F.2d 838, 845 (D.Conn.1925) (dictum); S. Crandall, *Treaties* § 74 (2d ed. 1916). The same appears to be the case with respect to criminal sanctions. *The Over the Top,* 5 F.2d at 845; Dickinson, *supra,* at 449–50.

Apart from those few instances in which the language of the provision expressly calls for legislative implementation or the subject matter is within the exclusive jurisdiction of Congress, the question is purely a matter of interpretation. *Id.* at 449. In carrying out our interpretive task, "we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943) (citations omitted). In the specific context of determining whether a treaty provision is self-executing, we may refer to several factors:

the purposes of the treaty and the objectives of its creators, the existence of domestic procedures and institutions appropriate for direct implementation, the availability and feasibility of alternative enforcement methods, and the immediate and long-range consequences of self- or non-self-execution.

*People of Saipan v. United States Department of Interior,* 502 F.2d 90, 97 (9th Cir. 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). With these principles in mind, we proceed to examine the treaty provision in issue here, article 6 of the Convention on the High Seas.

Article 6 declares the exclusivity of a nation's jurisdiction over the vessels entitled to fly its flag: "Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas." [23] On its face, this language would bear a self-executing construction because it purports to preclude the exercise of jurisdiction by foreign states in the absence of an exception embodied in treaty. We are admonished, however, to

*Article 28*
Every State shall take the necessary legislative measures to provide that, if persons subject to its jurisdiction who are the owners of a cable or pipeline beneath the high seas, in laying or repairing that cable or pipeline, cause a break in or injury to another cable or pipeline, they shall bear the cost of the repairs.

*Article 29*
Every State shall take the necessary legislative measures to ensure that the owners of ships who can prove that they have sacrificed an anchor, a net or any other fishing gear, in order to avoid injuring a submarine cable or pipeline, shall be indemnified by the owner of the cable or pipeline, provided that the owner of the ship has taken all reasonable precautionary measures beforehand.

**23.** Article 6 should be read in conjunction with article 2, which codifies the principle of freedom of the seas. It provides as follows:

*Article 2*
The high seas being open to all nations, no State may validly purport to subject any part of them to its sovereignty. Freedom of the high seas is exercised under the conditions laid down by these articles and by the other rules of international law. It comprises, *inter alia,* both for coastal and non-coastal States:
(1) Freedom of navigation;
(2) Freedom of fishing;
(3) Freedom to lay submarine cables and pipelines;
(4) Freedom to fly over the high seas.
These freedoms, and others which are recognized by the general principles of international law, shall be exercised by all States with reasonable regard to the interests of other States in their exercise of the freedom of the high seas.

interpret treaties in the context of their promulgation, and we think the context of article 6 compels the conclusion that it is not self-executing.

■ We start with the observation that the Convention on the High Seas, as its preamble states, is intended to be "generally declaratory of established principles of international law." Indeed, that a state enjoys exclusive jurisdiction over its flag vessels, in the absence of an exception sanctioned under customary international law, is just such a principle. *See The S.S. Lotus,* [1927] P.C.I.J., ser. A, No. 10, at 25; *Le Louis,* 165 Eng.Rep. 1464, 1475 (Adm.1817); 1 L. Oppenheim, *International Law* 589 (8th ed. Lauterpacht 1955). But the question we must answer is whether by ratifying the Convention on the High Seas the United States undertook to incorporate the restrictive language of article 6, which limits the permissible exercise of jurisdiction to those provided by treaty, into its domestic law and make it available in a criminal action as a defense to the jurisdiction of its courts. There is nothing in the circumstances surrounding the formulation and adoption of the Convention that would support the conclusion that it did.

The Convention on the High Seas is a multilateral treaty which has been ratified by over fifty nations, some of which do not recognize treaties as self-executing.[24] It is difficult therefore to ascribe to the language of the treaty any common intent that the treaty should of its own force operate as the domestic law of the ratifying nations. This is not to say that by entering into such a multilateral treaty the United States cannot without legislation execute provisions of it, but one would expect that in these circumstances the United States would make that intention clear. The lack of mutuality between the United States and

countries that do not recognize treaties as self-executing would seem to call for as much. Here there was no such manifestation.

The 1958 United Nations .Conference on the Law of the Sea, which promulgated the conventions at issue here, adopted article 6 verbatim as submitted to it by the International Law Commission, which had been convened to draw a draft convention. *See* International Law Commission, *Report,* 11 U.N. GAOR, Supp. (No. 9) 25, U.N. Doc. A/3159 (1956). As McDougal and Burke point out: "At the 1958 Conference, very little attention was given to this portion of Article 30 [the Commission draft] and even certain inconsequential amendments proposed were not adopted. Article 6(1) therefore embodies the exact wording of Article 30 as it appears in . . . the 1956 Report of the Commission." M. McDougal & W. Burke, *The Public Order of the Oceans* 874 (1962) (footnote omitted). Had the United States interpreted the International Law Commission's draft article as a limitation of its jurisdiction to that expressly conferred by treaty, we think that considerably more attention would have been directed to the article, for a self-executing interpretation would severely curtail the traditional practice of the United States in exercising jurisdiction on the high seas in the absence of treaty as evidenced by substantial legislation designed to enforce customs regulations there.

A literal reading of article 6 would prohibit the exercise of jurisdiction in all cases that do not come within exceptions embodied in treaty. Therefore, if the article were self-executing, the United States would lack jurisdiction, by virtue of *Cook* and *Ford,* over vessels and their crews seized in the enforcement of interests not expressly recognized by treaty.[25] But, "[n]either in-

---

**24.** In Great Britain, for example, "the orthodox view is that treaties are not part of the law of England unless legislation has been enacted incorporating them. It seems therefore that British courts would probably not decline jurisdiction obtained in violation of a treaty." O'Higgins & Dublin, *Unlawful Seizure and Irregular Extradition,* 36 Brit.Y.B.Int'l L. 279, 301

(1960); *see Attorney-General for Canada v. Attorney-General for Ontario,* [1937] A.C. 326, 347 (P.C.) (Can.); A. McNair, *The Law of Treaties* 81–110 (1961).

**25.** This statement is subject to the qualification that the United States would not lack jurisdiction to adjudicate seizures made pursuant to

ternational treaties nor succeeding articles of the Convention exhaust the instances in which other competence to apply [sanctions] is honored under international law." M. McDougal & W. Burke, *supra*, at 875; *see United States v. F/V Taiyo Maru*, 395 F.Supp. 413, 420–21 (D.Me.1975).

Since its inception, the United States has asserted limited jurisdiction over vessels on the high seas, generally but not always within the twelve-mile limit, to enforce a variety of interests not expressly authorized in treaties. As early as 1790, the United States professed authority to board vessels beyond the three-mile territorial sea.[26] In An Act to Provide More Effectually for the Collection of Duties, ch. 35, 1 Stat. 145 (1790), the United States first specified a twelve-mile limit in which foreign vessels bound for the United States could be boarded to examine their manifests and inspect their cargoes. The Act also prohibited the unloading of foreign goods within twelve miles. Severe sanctions, including fines and forfeitures, were imposed for violation of its provisions.[27]

The Supreme Court, in the seminal case of *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804), approved this legislation as within the sphere of a nation's competence to protect against the violation of its laws beyond the territorial sea. Chief Justice Marshall, writing for the Court, made the following observations in dictum:

> The authority of a nation, within its own territory, is absolute and exclusive. . . But its power to assure itself from injury may certainly be exercised beyond the limits of its territory. Upon this princi-

ple, the right of a belligerent to search a neutral vessel on the high seas, for contraband of war, is universally admitted, because the belligerent has a right to prevent the injury done to himself, by the assistance intended for his enemy; so, too, a nation has a right to prohibit any commerce with its colonies. Any attempt to violate the laws made to protect this right, is an injury to itself, which it may prevent, and it has a right to use the means necessary for its prevention. These means do not appear to be limited within any certain marked boundaries, which remain the same, at all times and in all situations. If they are such as unnecessarily to vex and harass foreign lawful commerce, foreign nations will resist their exercise. If they are such as are reasonable and necessary to secure their laws from violation, they will be submitted to.

6 U.S. at 234–35, 2 L.Ed. at 264–65. This proposition was buttressed by reference to the United States' practice as reflected in the customs statutes discussed above giving the right to "our own revenue cutters to visit vessels four leagues from our coast." *Id.* at 236, 2 L.Ed. at 265. More particularly, Justice Story, interpreting the successor to the provision of the 1790 Act prohibiting unloading of cargoes within four leagues of the coast without payment of duties, wrote, "[T]he policy of the act equally applies to all vessels; and indeed more strongly to foreign vessels; since frauds committed by them in evasion of the revenue laws are less easily detected, then like frauds are under the regulations applicable to American vessels." *The Betsy*, 3 F.Cas. 303, 304 (C.C.D. Mass.1818) (No. 1,365).

federal legislation enacted after the date of ratification (April 12, 1961) since subsequent federal legislation overrides prior self-executing treaty provisions, *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Edye v. Robertson (The Head Money Cases)*, 112 U.S. 580, 599, 5 S.Ct. 247, 254 (1884).

**26.** In the same year Congress created the Revenue Cutter Service (later to become the Coast Guard), ch. 35, § 62, 1 Stat. 175 (1790), whose officers

> shall respectively be deemed officers of the customs, and shall have power and authority

> to go on board of every ship or vessel which shall arrive within the United States, or within four leagues of the coast thereof, if bound for the United States, and to search and examine the same and every part thereof, and to demand, receive and certify the manifests herein before required to be of certain ships or vessels.

Ch. 35, § 64, 1 Stat. 175 (1790).

**27.** This Act is extensively discussed in W. Masterson, *Jurisdiction in Marginal Seas* § 43 (1929).

The 1790 Act is the progenitor of successive enactments authorizing the boarding and searching of foreign vessels within twelve miles of the coast of the United States and imposing penalties for violations of customs provisions operating within that limit.[28] Through the years the courts have had numerous occasions to address the issue of the propriety of the exercise of United States jurisdiction over foreign vessels within twelve miles but beyond three miles under these statutes and in the absence of treaty. A sampling of those cases is collected in the margin.[29]

It is clear, therefore, that the consistent attitude of the United States has been that it may assert limited jurisdiction over foreign vessels within twelve miles of its coast. Although the conventions we construe today do provide for some control within this zone, the ambit of this control is much narrower than that which the United States has customarily asserted. *See United States v. F/V Taiyo Maru*, 395 F.Supp. 413 (D.Me.1975); M. McDougal & W. Burke, *supra*, at 612–31, 875. A self-executing interpretation, which would eviscerate many of these provisions, would, therefore, be wholly inconsonant with the historical policy of the United States.

The United States has not, however, limited its claims of jurisdiction to twelve miles.[30] In an attempt to quell the ever increasing smuggling of alcohol into the United States, Congress enacted the 1935 Anti-Smuggling Act, Act of Aug. 5, 1935, Pub.L. No. 238, 49 Stat. 517. This act, presently codified at 19 U.S.C. §§ 1701–1711 (1976), empowers the President, upon belief that a hovering vessel is engaged in smuggling "any merchandise or person," *id.* § 1701(a), to designate temporary enforcement zones in the place where such vessel is found. These zones may extend up to sixty-two miles from the coast and 100 miles laterally in both directions from the vessel. *Id.* The Act goes on to authorize customs officers to board and inspect "any vessel" within such zone and "to pursue and seize or arrest and otherwise enforce upon such vessel, merchandise, or person, the provisions of the law . . . ." *Id.* § 1701(b). The committee reports clearly indicate that the Act was founded on the rule of *Church v. Hubbart*, discussed above, and they make clear that Congress believed it was acting

28. The history of some of these provisions is recounted in considerable detail in Carmichael, *At Sea with the Fourth Amendment*, 29 U. Miami L.Rev. 51, 65–69 (1977). The present descendants of this early act include 19 U.S.C. §§ 1401(j), 1709(c) (1976) (defining "customs waters" as those within twelve miles of the coast), 19 U.S.C. § 1581 (1976) (providing for boardings and searches within customs waters), and 19 U.S.C. § 1586 (1976) (imposing penalties for unloading or transshipment within customs waters).

29. *The Metmuzel*, 49 F.2d 368 (4th Cir.), *cert. denied*, 283 U.S. 866, 51 S.Ct. 657, 75 L.Ed. 1470 (1931); *The Cherie*, 13 F.2d 992 (1st Cir. 1926); *The Henry L. Marshall*, 292 F. 486 (2d Cir. 1923); *United States v. Bengochea*, 279 F. 537 (5th Cir. 1922); *The Amaranth*, 35 F.2d 872 (S.D.N.Y.1929); *The Mistinguette*, 14 F.2d 753 (S.D.N.Y.1926); *The Mariel E. Winters*, 6 F.2d 466 (S.D.Tex.1925); *The Grace and Ruby*, 283 F. 475 (D.Mass.1922).

30. We think it significant that the United States now asserts a 200 mile fishery conservation zone, which was established by the Fishery Conservation Act of 1976, Pub.L. No. 94–265, 90 Stat. 331. These provisions are codified in 16 U.S.C.A. §§ 1801–1882 (West Supp.1978), and they became effective as of March 1, 1977. Section 1812 establishes "exclusive fishery management authority" over all fish within the conservation zone, all anadromous species throughout their migratory range even if beyond the zone, and all Continental Shelf fishery resources beyond the zone. Section 1821 prohibits the taking of fish covered under § 1812 in the absence of agreement with the foreign nation concerned. Vessels of such nations must obtain permits under § 1824. The Act provides for civil and criminal penalties for foreign vessels found in violation of it, §§ 1858–1860, and the Coast Guard is given broad enforcement powers under § 1861.

This act, of course, supersedes the conventions we construe today, whether self-executing or not, because it came into force subsequent to them. See note 25 *supra*. Therefore, the Act is not an example of legislation that could be affected by article 6 of the High Seas Convention in any event. But we do think it clear evidence of the consistent policy of the United States in asserting jurisdiction for limited purposes beyond even the 12-mile limit and even in the absence of treaty.

in accordance with established precedent, both domestic and international.[31]

A recent article examined at length the interrelationship between the Anti-Smuggling Act and the Conventions on the High Seas and on the Territorial Sea and Contiguous Zone. Ficken, *The 1935 Anti-Smuggling Act Applied to Hovering Narcotics Smugglers Beyond the Contiguous Zone: An Assessment Under International Law*, 29 U. Miami L.Rev. 700 (1975). In his article, Ficken notes an issue strictly analogous to the one before us: "whether a United States court would uphold a seizure or arrest [under the Act] in view of the [*Cook*] exception indicating the possibility that the United States has by treaty imposed upon itself a territorial restriction of its jurisdiction." *Id.* at 724. He goes on to reason that "the approach to the issue is similar to the construction of the liquor treaty in the [*Cook*] case, the issue turning upon whether the treaty provision were given a self-executing character." *Id.* We have, therefore, in the 1935 Anti-Smuggling Act apparently another instance where a self-executing interpretation of article 6 of the High Seas Convention [32] would abrogate the legislative policy of the United States. Ficken concludes, however, that "it is doubtful whether it has changed any existing internal legislation." *Id.*

That we do not believe that it was the intent of the United States to so limit the operation of its statutes is borne out by the legislative history of the conventions. In testimony before the Senate Foreign Relations Committee, Mr. Arthur Dean, the Chairman of the United States Delegation to the 1958 Law of the Sea Conference, made the following remarks in response to questioning:

[SENATOR LONG] Mr. Dean, would you point out and explain any article of these conventions which has the effect of superseding domestic legislation in the United States, either Federal or State legislation, and would you also point out any articles which would require new Federal legislation?

MR. DEAN. Well, so far as I am aware, there is not anything in any of these conventions that we are presenting to the Senate which, so far as I am specifically aware, there is not anything that would supersede domestic legislation. I know you are familiar with the case of *Missouri v. Holland* [252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920)] that insofar as the United States has entered into a treaty that then becomes the law of the land. In all my work on these matters and study on these matters, while there may be some domestic legislation that might be affected—I am not familiar with it, if there is.

I think that as I said earlier, that all of these conventions would affect the relations of the United States in relation to the powers of other sovereign powers, and would not affect the relationship as between the United States and the several States.

*Conventions on the Law of the Sea: Hearings on Executives J, K, L, M, N Before the Comm. on Foreign Relations*, 86th Cong., 2d Sess. 75 (1960). Although Mr. Dean's statements are not wholly unequivocal, they do clearly indicate that it was not the intent of our delegation to affect the domestic legislation of the United States, either state or federal. Moreover, when the State Depart-

---

**31.** [T]here is no fixed rule among the customs and usages of nations which prescribes the limits of jurisdictional waters other than the rule of reasonableness, that a nation may exercise authority upon the high seas to such an extended and to so great a distance as is reasonable and necessary to protect itself and its citizens from injury. This principle, which is believed to be controlling law today, was established in American law by Chief Justice Marshall in *Church v. Hubbart* . . .

S.Rep. No. 1036, 74th Cong., 1st Sess. 5 (1935).

**32.** As we indicated above in note 20, Ficken analyzes the problem from the assumption that the seizure of a foreign vessel beyond 12 miles would be a violation of article 24 of the Convention on the Territorial Sea and Contiguous Zone. Although we disagree with his assumption in that we believe article 6 of the Convention on the High Seas provides the operative rule, we think his argument may otherwise have validity.

ment was posed the same question by the Senate Committee, it responded, "It does not appear that any of the convention provisions conflict with existing legislation. It does appear that some supplementary and new implementing legislation may be necessary or desirable." *Id.* at 92. We think these statements weigh against a self-executing interpretation of article 6.

Practically every observation we have made thus far concerning article 6 of the Convention on the High Seas and its effect if self-executing stands in stark contrast to the liquor treaty construed to be self-executing in *Cook*, the Convention for the Prevention of Smuggling of Intoxicating Liquors, Jan. 23, 1924, United States-Great Britain, 43 Stat. 1761. First, the liquor treaty with Great Britain was bilateral and established mutual rights and obligations. The United States was granted the privilege of boarding any British vessel within one hour's sailing distance of the coast for the purpose of examining the vessel's manifest. If reasonable grounds for suspecting that she was smuggling liquor arose the vessel could be searched, and, if reasonable cause arose to believe that the vessel was engaged in such activity the vessel could be seized and subjected to adjudication by the courts of the United States. These rights were narrowly circumscribed by the limitation that they be exercised within one hour's sailing distance only.[33] On the other hand, Great Britain was insured that the United States would not penalize British vessels that brought liquor into United States waters under seal in certain specified circumstances, *id.* art. 3, thus reversing the Supreme Court's opinion in *Cunard Steamship Co. v. Mellon*, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923), which had held that the National Prohibition Act prohibited foreign vessels from bringing liquors into United States territory or territorial waters even if under seal and not for delivery in the United States.[34] As Masterson notes,

> The desire of the United States Government to break up the "rum-row" with the aid of far-reaching treaties, and the desire of foreign governments that their vessels be permitted to enter the ports and waters of the United States with alcoholic beverages under seal on board, presented an opportunity for a

---

**33.** The relevant provisions of the treaty are displayed below.

ARTICLE II.

(1) His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force. When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

(2) If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with such laws.

(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States its territories or possessions by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised. 43 Stat. 1761–62.

**34.** This provision was obviously intended to be self-executing. "There was little difficulty in concluding that Article III of the treaties, which provided that no forfeiture or penalty should attach the transportation of sealed liquors in American waters was self-executing. In other words, no legislation was required to give it effect. The treaty *ipso jure* superseded and repealed so much of the prohibition acts as was inconsistent therewith." P. Jessup, *The Law of Territorial Waters and Maritime Jurisdiction* 300–01 (1927) (footnote omitted).

bargain, for which all parties were unquestionably eager. Public sentiment in Great Britain against the decision in *Cunard v. Mellon* and the indignation in the United States over the conditions that existed off the coasts induced the representatives of both countries to renew their negotiations for a treaty in 1923, which had been begun in 1922.

W. Masterson, *Jurisdiction in Marginal Seas* 335–36 (1929) (footnote omitted); *accord, United States v. Ford*, 273 U.S. 593, 609–10, 47 S.Ct. 531, 536, 71 L.Ed. 793 (1927). Article 4 of the treaty established a mechanism for settling claims by British vessels that suffered loss from the improper exercise of the powers granted the United States under the treaty. As we noted above, article 6 of the High Seas Convention is a provision of a multilateral treaty, and it imposes no reciprocal obligations upon nations where it could not have self-executing effect. See note 24 *supra* and accompanying text.

Second, the liquor treaty addressed the specific problem of liquor smuggling. Its operation is strictly limited to that concern. Therefore, a self-executing interpretation would affect the jurisdiction of the United States only as regards seizures of British vessels engaged in smuggling liquor; the extraterritorial jurisdiction of the United States remained otherwise unaffected. Article 6, however, is a sweeping prohibition on the exercise of jurisdiction against foreign vessels on the high seas. A self-executing interpretation would therefore impinge upon the operation and enforcement of any law sought to be applied.

Third, as the Court was eager to point out in *Cook*, the Secretary of State had expressed the view that "in a strict sense the Treaty was self-executing." 288 U.S. at 119 & n.19, 53 S.Ct. at 311. The views of the State Department carry substantial weight in these matters, *see Factor v. Laubenheimer*, 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933); *Charlton v. Kelly*, 229 U.S. 447, 468, 33 S.Ct. 945, 952, 57 L.Ed. 1274 (1913), and it is therefore difficult to speculate as to the outcome of the case if no such opinion had been available to the Court. Here, both the chairman of the United States delegation to the 1958 Law of the Sea Conference and the State Department were of the view that the conventions do not affect domestic law.

Fourth, the liquor treaty was occasioned not so much by a concern on the part of the United States about the validity of seizures beyond the three-mile limit but by a desire to avoid the repeated protests that the British had lodged against such seizures. W. Masterson, *supra*, at 304–05, 326. Indeed, article 2 of the treaty begins with the following phrase, "His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of the territorial waters by the authorities of the United States . . . ." See note 32 *supra*. The British were staunch in their opinion that boardings and seizures beyond three miles for the enforcement of any domestic law were not justified. W. Masterson, *supra*, at 331–33 & n. 6. It was absolutely clear, therefore, that the British position was that any interference not justified by the treaty would be unacceptable and subject to protest. Therefore, it was assumed that Great Britain would assert the rights of its vessels and their crews under international law not to be subjected to adjudication. Without such objection, the doctrine embodied in the *Ker* case would apparently have validated the jurisdiction of the court notwithstanding the violation of international law. *See The Adela*, 73 U.S. (6 Wall.) 266, 18 L.Ed. 821 (1867); *cf. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir.) (failure to object "would seem to preclude any violation of international law which might otherwise have occurred"), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). The circumstances here are quite different. It may well be that a signatory to the High Seas convention would not object to the seizure of one of its vessels on the high seas. That is apparently the case here because the record does not indicate that a protest was made to the seizure of the *La Rosa* or to the subjection of its crew to the jurisdiction of the district court below. It might well be that by not so objecting, the Grand

Caymans intended to acquiesce. *See Lujan v. Gengler,* 510 F.2d at 67. A self-executing interpretation of article 6 would establish a defense to the jurisdiction of the United States in every case because its prohibition would be as authoritative as a statute of Congress depriving the United States courts of jurisdiction where seizure is effected in violation of the article. The executory interpretation we approve today leaves to the injured state the option of deciding whether it wishes to object. As we recently intimated in *United States v. Cadena,* 585 F.2d 1252, 1261 (5th Cir. 1978), "The violation of international law . . . may be redressed by other remedies and does not depend upon the granting of what amounts to an effective immunity from criminal prosecution to safeguard individuals against police or armed forces misconduct."

■■ In sum, we do not believe that the United States intended to limit its traditionally asserted jurisdiction over foreign vessels on the high seas by adopting article 6 of the High Seas Convention. The determination of this intent must be the touchstone of our interpretation. Moreover, we think the liquor treaty held to be self-executing in *Cook* wholly distinguishable.[35] We hold, therefore, that article 6 is not self-executing and that, by virtue of the *Ker-Frisbie* doctrine, the defendants cannot rely upon a mere violation of international law as a defense to the court's jurisdiction.

## C. *Additional Issues*

The defendants allege numerous additional points of error. Rather than attempt to catalog them now, we address them as we present them below.

### 1. *The Coast Guard's Authority*

■ The defendants contend that the Coast Guard lacks statutory authority to act against foreign vessels on the high seas beyond the twelve-mile limit.[36] This argument was squarely rejected by our recent decision in *United States v. Cadena,* 585 F.2d 1252 (5th Cir. 1978). There we held that 14 U.S.C. § 89(a) (1976) authorized the seizure of a foreign vessel some 200 miles at sea and the arrest of its crew. *Id.* at 1259. Section 89(a) empowers the Coast Guard to

make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

In *Cadena* we held that vessels become "subject to the jurisdiction, or to the operation of any law, of the United States" within the meaning of section 89(a) if they are engaged in a conspiracy to violate federal narcotics statutes. 585 F.2d at 1259. Here there was probable cause to believe the defendants were conspiring to smuggle contraband, and therefore the second boarding and seizure of the *La Rosa* and the defendants' arrests were authorized by section 89(a).

---

35. We are well aware of the suggestion in *United States v. Cadena,* 585 F.2d at 1260 & n. 17, that the reasoning of the *Cook* case regarding the liquor treaty is equally applicable to article 22 of the Convention on the High Seas and therefore that it would supersede prior domestic legislation. We are not bound by this language for two reasons. First, the passage is clearly obiter dictum because the court held that the defendants could not avail themselves of the prohibition of article 22 since the nation under whose flag they had sailed had not ratified the Convention on the High Seas. See note 8 *supra.* Second, even if the court's dic-

tum were authoritative, it is addressed to article 22 and not article 6, the provision of concern to us. We expressly determined above that article 22 was not breached here. A treaty need not be wholly self-executing or wholly executory. *See, e.g.,* P. Jessup, *The Law of Territorial Waters and Maritime Jurisdiction* 300–01 (1927). Therefore, a self-executing interpretation of article 22 would not necessarily call for a similar interpretation of article 6.

36. For a discussion of the Coast Guard's authority for the first boarding, see note 15 *supra.*

The defendants make a related argument concerning the authority of the Coast Guard in effecting the boarding of the *La Rosa* beyond the twelve-mile limit. They claim that customs regulations invalidate boardings of foreign vessels in violation of treaty obligations of the United States.[37] This argument may be dismissed on alternative grounds, first, under the *Ker-Frisbie* doctrine the lack of authority of an arresting officer does not affect the jurisdiction of the court. Moreover, a lack of such authority is not of constitutional magnitude and therefore would be an inappropriate occasion for invoking the exclusionary rule. *See United States v. Cadena*, 585 F.2d at 1264 & n.28. Second, since the Coast Guard boarded the *La Rosa* under the authority of section 89, it is immune from regulations infringing the plenary authority granted by this section. Although section 89(b) subjects the Coast Guard officers to customs regulations, section 89(c) provides that "[t]he provisions of this section are in addition to any powers conferred by law upon such officers, and not in limitation of any powers conferred by law upon such officers, or any other officers of the United States." In *United States v. Warren*, 578 F.2d 1058, 1068 (5th Cir. 1978) (en banc), we held that section 89(c) was "intended to give the Coast Guard the broadest authority available under law" and therefore interdicted any contrary regulations. We find *Warren* controlling here.

### 2. Jurisdiction Over The Crime

The defendants urge that the United States lacked competence to prescribe rules making their conduct on the high seas criminal. A necessary condition to the competence of a state to enforce its laws is that it have capacity to prescribe them. *Restatement (Second) of Foreign Relations Law of the United States* § 7(2) (1965). The United States has long adhered to the objective principle of territorial jurisdiction, which holds that it has jurisdiction to attach criminal consequences to extraterritorial acts that are intended to have effect in the United States,[38] at least where overt acts within the United States can be proved. *Ford v. United States*, 273 U.S. 593, 620, 47 S.Ct. 531, 540, 71 L.Ed. 793 (1927); *United States v. Cadena*, 585 F.2d 1252, 1257–58 (5th Cir. 1978); *United States v. Winter*, 509 F.2d 975, 981 (5th Cir.), *cert. denied sub nom. Parks v. United States*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Rivard v. United States*, 375 F.2d 882, 886 (5th Cir.), *cert. denied sub nom. Groleau v. United States*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967); *cf. Strassheim v. Daily*, 221 U.S. 280, 284–85, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911) (interstate extradition). The United States has exercised this competence in enacting the statutes under which the defendants were convicted, 21 U.S.C. §§ 846, 963 (1976), which prohibit conspiracies to distribute and import controlled substances. Implicit in these prohibitions, taken together, is that they apply extraterritorially. *See United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922); *Brulay v. United States*, 383 F.2d 345, 349–50 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). As we said in *United States v. Cadena*, 585 F.2d at 1259, "Congress intended that [21 U.S.C. § 963] apply to persons who commit[ted] acts or a series of acts that at least commenced outside the territorial limits of the United States." Therefore, if an overt act committed within the United States was

---

37. The relevant regulation is found in 19 C.F.R. § 162.3(a) (1978), which provides in pertinent part as follows:

 (a) *General Authority.* A customs officer, for the purpose of examining the manifest and other documents and papers and examining, inspecting and searching the vessel, may at any time go on board:

 . . . . .

 (3) Any vessel within a Customs Enforcement area designated under such provi-

sions of the Anti-Smuggling Act (19 U.S.C. §§ 1701–11) but Customs officers shall not board a foreign vessel upon the high seas in contravention of any Treaty with a foreign government or in absence of a special arrangement with the foreign government concerned.

38. That the defendants intended effects within the United States is established below in part II. 6.

proved by the Government,[39] the defendants fall within the proscriptions of sections 846 and 963.

 The record indicates that defendant Chitty directed the outfitting of the *La Rosa* in Fort Lauderdale, Florida, in late June 1976. Record, vol. 2, at 18–22. Payment was tendered in Fort Lauderdale, *id.* at 22–25, and approximately $21,000 of the $153,000 purchase price was paid by Chitty in cash, *id.* at 22–23.[40] The record further indicates that the *La Rosa* was delivered in Bimini on July 3, *id.* at 25, and that Postal and Chitty flew to Bimini on that date, *id.,* vol. 3, at 110. The *La Rosa's* logbook,

which was introduced into evidence at trial,[41] shows that she left Bimini on or about July 4. *Id.* at 78. She then sailed to South America where the marijuana was presumably obtained, and then she returned, arriving back off the Bahamas on September 13.[42] She continued southwesterly toward Miami and then along the Florida Keys where she was boarded and seized by the Coast Guard on September 15.

 The indictment against the defendants charges the purchase of the *La Rosa* in Fort Lauderdale as an overt act under both conspiracy counts. The defendants contend

**39.** We do not intend to imply that an overt act within the United States is a necessary condition to the application of § 963. That section does not expressly require that an overt act be proved, and it is now the settled law of this circuit that it is not necessary that one be proved. *United States v. Johnson,* 575 F.2d 1347, 1366 (5th Cir. 1978); *United States v. Littrell,* 574 F.2d 828, 832 (5th Cir. 1978); *United States v. Thomas,* 567 F.2d 638, 641 (5th Cir. 1978). This result may well lead to the conclusion that the proof of an overt act within the United States is no longer required for jurisdictional purposes and that mere proof of intended territorial effects is sufficient. We need not, however, resolve this issue because we find that an overt act was proved to have occurred in the United States.

**40.** The *La Rosa* was purchased by Summerland Corp., which was stipulated by the Government to be a validly formed and registered Grand Cayman corporation. Record, vol. 3, at 9.

**41.** The defendants objected to the admission of the logbook on the ground that it was hearsay. Although it is not clear who authored the logbook (it appears to have been kept by more than one of those on board the *La Rosa* ) we think it inescapable that one of the crew of the *La Rosa* did so. There is no doubt that the logbook was that of the *La Rosa* because it was the only such book found, and its fixes corresponded closely to notations on charts also found on board. Record, vol. 3, at 97. Moreover, one of the final entries indicated a time and course corresponding closely to that of the *La Rosa* while it was under surveillance by the Coast Guard. *Id.,* vol. 2, at 62–63.

Under these circumstances the logbook was properly admissible as a declaration of a coconspirator during and in furtherance of the conspiracy under Fed.R.Evid. 801(d)(2)(E). We do not, in making this determination, assume the conclusion we are seeking to reach—that a conspiracy existed when the boat was pur-

chased—because it is not necessary that the conspiracy upon which admissibility of the statement is predicated be that charged. Moreover, the agreement need not be criminal in nature. These observations are borne out by the legislative history of rule 801(d)(2)(E). "While [this] rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." S.Rep.No.93–1277, 93d Cong., 2d Sess. 24, *reprinted in* [1974] U.S.Code Cong. & Admin. News, pp. 7051, 7073. It is clear to us that the voyage was a "joint venture" in and of itself apart from the illegality of its purpose and that the logbook was therefore admissible as nonhearsay under the rule.

**42.** The log and charts found aboard the *La Rosa* indicate that she proceeded southeasterly from Bimini along the northern coasts of the Dominican Republic and Puerto Rico and then entered the Caribbean. She continued southward along the Leeward Islands, and she anchored at Martinique on July 29. Record, vol. 3, at 103. After approximately two weeks, she set sail, heading southward along the Leeward Islands. She then changed to a westerly course, which took her near Bonaire, off the coast of Venezuela. She sailed as far west as Riohacha, Colombia, on August 19. She then reversed her course and arrived on August 24 in Aruba, an event occasioned by the remark in the logbook "Were [sic] there!"

Several pages of the log that had been jettisoned when the *La Rosa* was approached by the Coast Guard are missing at this point, but it appears that she left Orangestad, Saint Eustatius, on August 25 and arrived just east of Great Issac, Bahamas, on September 13. From there she sailed southwesterly until she was seized by the *Cape York* on September 15. The last entry noted is at 1:10 p.m. on that date, a time between the first and second boardings.

that the Government did not prove that a conspiracy existed among them at the time of the purchase of the *La Rosa* and therefore that the act of purchasing her cannot constitute an act in furtherance of the conspiracy. *See United States v. Easom,* 569 F.2d 457, 459 (8th Cir. 1978). We think the evidence in the record, although circumstantial, is sufficient to support a finding that a conspiracy existed when the *La Rosa* was purchased.

The defendants set sail for South America within a day of the delivery of the *La Rosa* in Bimini. Within ten weeks she returned to the Bahamas with some four tons of marijuana on board. Construing the evidence in the light most favorable to the Government and indulging all reasonable inferences in its favor, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Alonzo,* 571 F.2d 1384, 1387 (5th Cir. 1978), we find this evidence sufficient to eliminate every reasonable hypothesis that the conspiracy had not been formed at the time the *La Rosa* was purchased. *See United States v. Bobo,* 586 F.2d 355, 368–69 (5th Cir. 1978). The only conceivable hypothesis that the *La Rosa* was purchased for innocent purposes is that the cruise to South America was not originally undertaken to obtain the marijuana but that the opportunity unexpectedly presented itself. Given the magnitude of the enterprise and the deliberateness with which it was carried out, we do not believe the reasonableness of this hypothesis is compelled as a matter of law. We therefore hold that the court below had jurisdiction over the conspiracies charged against the defendants.

### 3. *The Miranda Contentions*

■ The defendants argue that *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was violated in several instances. First, they claim that they were entitled to receive *Miranda* warnings from CPO Lewis when first boarded because that boarding created a custodial situation. *See id.* at 444, 86 S.Ct. at 1612. This boarding was a routine boarding under the well-es-

tablished maritime doctrine of right of approach, and was intended merely to ascertain the nationality of the *La Rosa.* Indeed, when that task was accomplished, CPO Lewis, who had boarded alone, was recalled to the *Cape York.* This circuit, sitting en banc, recently held that a routine Coast Guard boarding does not in and of itself create a custodial situation calling for the reading of *Miranda* rights. *United States v. Warren,* 578 F.2d 1058, 1070 (5th Cir. 1978) (en banc). Moreover, nothing that CPO Lewis did after he boarded required that he give the warnings. Postal's statement "Can you be bought?" was apparently volunteered without any prompting on the part of CPO Lewis, who had merely asked to see the *La Rosa's* papers. Therefore, we find *Warren* controlling here.

■ Second, it is argued that the statements made by the defendants to Lt. Beardsworth and Chief Gaskill aboard the *Cape York* after their arrest were barred by *Miranda.* By this time the defendants had been read their rights twice—once on board the *La Rosa* by CPO Lewis upon the second boarding and again by Lt. Beardsworth when the defendants were brought aboard the *Cape York.* The unrefuted testimony of Chief Gaskill was that the statements were volunteered and that he asked absolutely no questions of any of the defendants during the period when they uttered the incriminating statements. Record, vol. 3, at 247. *Miranda,* by its own terms, does not exclude such statements: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1630; *United States v. Garcia-Godos,* 541 F.2d 1123 (5th Cir. 1976) (per curiam) (voluntary post-*Miranda*-warning statements admissible). Similarly, the record does not indicate that the statement made by Postal to Lt. Beardsworth that the *La Rosa* was low on fuel was anything but voluntary. Therefore, we hold the defendants' statements not to have been admitted in violation of *Miranda.*

#### 4. The Bruton Issue

The defendants question the admissibility of their postarrest statements against those not uttering them on the dual basis that they are hearsay and violative of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which holds that one codefendant's confession implicating another is inadmissible if the confessor refuses to testify. Since we find these statements properly admissible for nonhearsay purposes, we find that their admission did not contravene *Bruton.*

■ We start with the observation that the postarrest utterances of coconspirators do not qualify as nonhearsay under Fed.R. Evid. 801(d)(2)(E), which removes from the realm of hearsay statements made by a coconspirator during and in furtherance of the conspiracy. A coconspirator's participation in a conspiracy ends with his arrest, and therefore his postarrest statements are not made during the course of the conspiracy. *United States v. Arias-Diaz,* 497 F.2d 165, 171 (5th Cir. 1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). *See United States v. Warren,* 578 F.2d at 1058. It does not follow, however, that because a coconspirator statement does not come within rule 801(d)(2)(E) it is inadmissible for any purpose. The statement may be probative of an issue at trial apart from the truth or falsity of its contents, and if so it may be admissible as nonhearsay because it is not offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c). We think the postarrest statements made here are of substantial probity with respect to several significant issues regardless of whether the matters they assert are in fact true.

■ The questioned statements include that of Chitty made to Chief Gaskill, "We made a mistake by throwing the papers overboard and not—laying [*sic*] offshore until a pickup." Also contested is the statement attributed by Gaskill to both Postal and Forsythe, "It was to be an $80,000— one-time shot for $80,000." Finally, the defendants dispute the admissibility of the statement made by Postal to Lt. Beards-

worth that the *La Rosa* was low on fuel. We shall take up the statements made to Gaskill first.

Chitty's statement is highly probative of a crucial issue in the case, the intent of the defendants to import the marijuana into the United States. This is an essential element of the crime under 21 U.S.C. § 963 (1976). The statement is probative independent of the truth-value of the matter asserted. It is irrelevant whether in fact boats were coming to pick up the marijuana from the *La Rosa* while she hovered beyond the twelve-mile limit. The probity of the statement derives wholly from the fact that Chitty *thought* that they were, thereby tending to show that he intended that the marijuana be introduced into the United States. By the same reasoning, the utterance is probative of the defendants' intent to distribute the marijuana, an element of the conspiracy charged under 21 U.S.C. § 846 (1976). Moreover, the mere fact that he made the statement is relevant to the issues of Chitty's knowledge of the conspiracy and his participation in it. *Cf. United States v. Bobo,* 586 F.2d 355, 371–72 (5th Cir. 1978).

Similarly, the statements of Postal and Forsythe made to each other in the presence of Chief Gaskill tend to prove their participation in the conspiracy and their knowledge of it, wholly apart from whether the "deal" was in fact "one-shot" or "for $80,000." The relevance of the assertions derives from their shared conception that the cruise was designed to accomplish that end. These statements, like Chitty's, are probative of the defendants' intent to distribute the marijuana.

Postal's statement to Lt. Beardsworth has nonhearsay significance because the termination of the voyage in the United States would be a probable consequence of Postal's belief—whether well-founded or not—that the *La Rosa* was low on fuel. That Postal thought the *La Rosa* was low on fuel was clearly inconsistent with his statement that the *La Rosa* was en route to Belize. For these reasons, we find the statements admissible for nonhearsay purposes.

We now turn to the *Bruton* problem, which evaporates by virtue of our conclusion that the statements are admissible for nonhearsay purposes. *Bruton* concerned a postarrest *confession* of one codefendant sought to be introduced against the other. Confessions characteristically have little, if any, probative value for purposes other than the truth of the matter asserted in them, and therefore they generally fall within the heartland of hearsay. It is precisely the inability of a codefendant effectively to dispute the truth of a confession that led the court in *Bruton* to hold its introduction violative of the confrontation clause. 391 U.S. at 136 & n.12, 58 S.Ct. at 1628. But when the statement has probity independent of its truth, to that extent there is no confrontation issue. The only question is whether the declarant in fact uttered the statement, and the witness who relates the statement is fully subject to all the rigors of cross-examination.

[A defendant is] not deprived of any right of confrontation on the issue of whether [the codefendant] actually made the statement related by [the witness]. Neither a hearsay nor a confrontation question would arise had [the witness's] testimony been used to prove merely that the statement had been made. The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.

*Dutton v. Evans*, 400 U.S. 74, 88, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) (footnote omitted). We find no *Bruton* error here.

5. *The Fourth Amendment Issues*

■ As we noted above, see note 15, the initial boarding of the *La Rosa*, occurring within the twelve-mile limit, was authorized by 19 U.S.C. § 1581(a) (1976) and 19 C.F.R. § 162.3(a)(1) (1978).[43] These provisions authorize routine documentary checks without probable cause or articulable suspicion, and they apply equally to foreign and domestic vessels. *United States v. Freeman*, 579 F.2d 942, 945 (5th Cir. 1978); *cf. United States v. Warren*, 578 F.2d 1058, 1067–70 (5th Cir. 1978) (en banc) (construing analogous provisions in 14 U.S.C. § 89(a) (1976)). In *Freeman* we analyzed the fourth amendment ramifications of section 1581(a) and concluded that boardings pursuant to its provisions for the purpose of making documentary checks are both "statutorily authorized and constitutionally permissible." 579 F.2d at 947. Therefore, we find the first boarding constitutionally unimpeachable.

■ A concomitant to the prerogative to board is the authority, indeed the duty, to act upon suspicions aroused during the boarding. *Id.* at 947–48. As we said in *Warren*, "[i]f, during the course of such an inspection, circumstances arise that generate probable cause to believe that a violation of United States law has occurred, the Coast Guard may conduct searches, seize evidence, and make arrests." 578 F.2d at 1065 (citing *United States v. Odom*, 526 F.2d 339, 342 (5th Cir. 1976)). We think it

**43.** The pertinent part of § 1581(a) states as follows:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

The relevant provisions of 19 C.F.R. § 162.3 (a)(1) are:

> *Boarding and Search of Vessels*
>
> (a) *General Authority.* A Customs Officer, for the purpose of examining the manifest and other documents and papers and examining, inspecting, and searching the vessel, may at any time go on board:
>
> (1) Any vessel at any place in the United States within the Customs waters of the United States . . . . ..

abundantly clear that probable cause to believe that a crime was being perpetrated or contemplated by the defendants arose on the first boarding and wholly as a result of the legitimate exercise of Coast Guard authority.

The most telling circumstance supporting this conclusion is, of course, the statement made by Postal during the first boarding asking CPO Lewis if he could be bought. There are other facts as well: Postal refused to allow the initial boarding; the *La Rosa* maneuvered so as to make the boarding difficult; the logbook pages showing positions in South America were thrown overboard; the *La Rosa*'s hatches, which had been open prior to the first boarding, were closed when CPO Lewis went aboard; and the *La Rosa* changed course after the first boarding to a heading taking her out of United States Customs waters. The district judge expressly found probable cause for the second boarding, Record, vol. 2, at 335, and we think these circumstances were more than ample to create probable cause and therefore provide constitutional justification for the second boarding and the seizure of the *La Rosa*. *United States v. Weinrich*, 586 F.2d 481, 492 (5th Cir. 1978); *United States v. Cadena*, 585 F.2d 1252, 1263 (5th Cir. 1978). Certainly the trial judge's finding was not clearly erroneous; therefore, it stands. *Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501 (1963).

■ We think the search of the *La Rosa* following the defendants' arrest well within constitutional limits because it was consented to by Forsythe. The record indicates that Forsythe opened the hatch of his own accord, revealing the marijuana. Record, vol. 3, at 205. Considering all the circumstances as we must, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973), we find the

search consensual. Forsythe had been given *Miranda* warnings at this point,[44] and although he had been arrested there is absolutely nothing in the record to support the inference that the search was coerced in any way. "[T]he fact of custody alone has never been enough to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *accord, United States v. Hall*, 565 F.2d 917, 920 (5th Cir. 1978). We think the validity of this search follows a fortiori from the search upheld in *Hall*,[45] where the defendant had been arrested but no *Miranda* warnings had been given:

> In sum there is no evidence in the record of any intimidation, physical or psychological abuse, or threats tending to invalidate the consent. The absence of a *Miranda* warning prior to the search is only one factor in assessing voluntariness. In light of the surrounding facts and circumstances, we are convinced that the consent was voluntary.

*Id.* at 921; *see United States v. Villarreal*, 565 F.2d 932, 937 (5th Cir. 1978).

We hold, therefore, that the first boarding was valid even without articulable suspicion as a documentary inquiry sanctioned by international custom and domestic legislation. The second boarding and seizure was premised on probable cause, and the search that ensued was consensual. We find no fourth amendment infirmity.

### 6. *Sufficiency of the Evidence*

■ The defendants' attack on the sufficiency of the evidence is addressed to the importation element of the conspiracy charged under 21 U.S.C. § 963 (1976). We think the evidence adduced at trial amply demonstrates that the defendants intended to import the marijuana seized on board the *La Rosa*. According to the testimony of

---

**44.** Of course, *Miranda* warnings are not a prerequisite to the admissibility of physical evidence. *United States v. Warren*, 578 F.2d at 1072, but their recitation has been found to be a factor in favor of voluntariness. *See United States v. Watson*, 423 U.S. 411, 425, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

**45.** Here, as in *Hall*, the defendants claimed to have been intoxicated and thus incapable of voluntary consent. "[I]ntoxication is a factor to consider, but that fact alone is not sufficient to undermine [their] consent." 565 F.2d at 921.

Chief Gaskill, Chitty stated that they, the defendants, had made a mistake in not waiting beyond the twelve-mile limit until the pickup boats had come. This statement, whether true or not, unequivocally demonstrates that it was the understood objective of the conspiracy to introduce the marijuana into the United States and to sell it there. Postal stated to Lt. Beardsworth that the La Rosa was low on fuel, and Forsythe answered no to CPO Lewis's question whether the defendants were really going to Belize. These statements as well tend to prove, independently of the truth of the matters they assert, that the defendants intended to import the marijuana. One additional fact of relevance is a statement in the La Rosa's logbook,[46] made the day before she was sighted by the Cape York. The statement reads as follows: "32 hours and 95 miles to go." Record, vol. 3, at 82. It was the testimony of Lt. Beardsworth, who had been qualified as an expert, that, given the time the entry was made and the position and course indicated, ninety-five miles would have put the La Rosa at American Shoal, near Key West. Id. at 92. Reviewing all these facts in the light most favorable to the Government, we find them more than sufficient to support the finding beyond a reasonable doubt that the defendants intended to import the marijuana.

### III. CONCLUSION

We have carefully considered the defendants' additional contentions of error and find them to be wholly without merit. For this reason and for the others stated above we affirm the defendants' convictions.

AFFIRMED.

---

**46.** The logbook was admissible to prove the truth of the matters it asserts because, as we indicated above, it is a statement of a coconspirator made during and in furtherance of the conspiracy. See note 41 supra.